*Oneida Indian Nation of New York, et al. v. County of Oneida, et al.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2007

Argued: June 3, 2008                    Decided: August 9, 2010

Docket Nos. 07-2430-cv(L), 07-2548-cv(XAP), 07-2550-cv(XAP)

_____

ONEIDA INDIAN NATION OF NEW YORK, ONEIDA TRIBE OF INDIANS OF
WISCONSIN, ONEIDA OF THE THAMES,

*Plaintiffs-Appellees-Cross-Appellants*,

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff-Appellee-Cross-Appellant*,

-v.-

COUNTY OF ONEIDA, COUNTY OF MADISON,

*Defendants-Cross-Appellees*,

STATE OF NEW YORK,

*Defendant-Appellant-Cross-Appellee*.

_____

Before: McLAUGHLIN, LIVINGSTON, *Circuit Judges*, and GERSHON,[*] *District Judge*.

Defendant-Appellant-Cross-Appellee State of New York, Plaintiffs-Appellees-Cross-

---

[*] The Honorable Nina Gershon, of the United States District Court for the Eastern District of New York, sitting by designation.

Appellants Oneida Nation of New York, Oneida Tribe of Indians of Wisconsin, and Oneida of the Thames, and Intervenor-Plaintiff-Appellee-Cross-Appellant United States of America each appeal from a decision of the United States District Court for the Northern District of New York (Lawrence E. Kahn, *District Judge*) granting in part the motion for summary judgment filed by the State of New York and the Counties of Oneida and Madison and thereby dismissing most of plaintiffs' claims as barred by laches. On appeal, the State of New York contends that the district court erred in allowing any claims to proceed. Meanwhile, the United States and the Indian Nation plaintiffs contend that the district court erred in dismissing any of the plaintiffs' claims, arguing both that this Court's earlier decision in *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005), on which the district court relied in dismissing plaintiffs' possessory claims, was incorrectly decided and that, even if *Cayuga* is left undisturbed, the defendants here have failed to establish the necessary elements of a laches defense. Like the district court, we conclude that the plaintiffs' possessory claims are barred by equitable defenses. We also conclude, however, that the purportedly nonpossessory claim identified by that court is also barred, both by New York's sovereign immunity and by the equitable principles applied in *Cayuga*. We finally conclude that the alternative nonpossessory claim articulated on appeal by the plaintiffs is likewise barred by *Cayuga*.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judge Gershon concurs in part and dissents in part in a separate opinion.

DENISE A. HARTMAN, Assistant Solicitor General (BARBARA D. UNDERWOOD, Solicitor General, ANDREW D. BING, Deputy Solicitor General, *on the brief*, and DWIGHT HEALY, White & Case, LLP, New York, New York, *of counsel*), *for* ANDREW M. CUOMO, Attorney General of the State of New York, Albany, New York, *for*

2

*Defendant-Appellant-Cross-Appellee State of New York.*

KATHRYN E. KOVACS, U.S. Department of Justice, Washington, D.C. (RONALD J. TENPAS, Acting Assistant Attorney General, CRAIG ALEXANDER, ELIZABETH ANN PETERSON, U.S. Department of Justice, Washington, D.C., *on the brief*, and THOMAS BLASER, U.S. Department of the Interior, Washington, D.C., *of counsel*), *for Intervenor-Plaintiff-Appellee-Cross-Appellant United States of America.*

MICHAEL R. SMITH (DAVID A. REISER, *on the brief*), Zuckerman Spaeder LLP, Washington, D.C., *for Plaintiff-Appellee-Cross-Appellant Oneida Indian Nation of New York.*

ARLINDA F. LOCKLEAR, Washington, D.C., *for Plaintiff-Appellee-Cross-Appellant Oneida Tribe of Indians of Wisconsin.*

CAREY R. RAMOS, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, *for Plaintiff-Appellee-Cross-Appellant Oneida of the Thames.*

DAVID M. SCHRAVER (DAVID H. TENNANT, *on the brief*), Nixon Peabody LLP, Rochester, New York, *for Defendants-Cross-Appellees County of Oneida, County of Madison.*

JOHN DOSSETT and VIRGINIA DAVIS, National Congress of American Indians, Washington, D.C., and KIM J. GOTTSCHALK, Native American Rights Fund, Boulder, Colorado, *for Amicus Curiae National Congress of American Indians.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

We are once again called upon to consider the availability of relief to Indian nations alleged to have been deprived long ago of their ancestral lands by the State of New York in violation of federal law. We adjudicate these ancient claims, dating back over two hundred years, against the background of over thirty years of litigation here and in the Supreme Court. These earlier cases, involving both present plaintiffs and the Cayuga Indian Nation, frame the issue now before us and

in large measure determine its outcome.

In 1970 the Oneida Indian Nation of New York ("New York Oneidas") and the Oneida Indian Nation of Wisconsin ("Wisconsin Oneidas") brought suit — a "test case" — seeking from the Counties of Madison and Oneida in New York State two years of fair rental value (for 1968 and1969) for about 872 acres occupied by these counties. This land represented a small portion of certain land ceded by the Oneida Indian Nation, the plaintiffs' ancestors, to New York State in 1795 in alleged violation of both federal treaties and the Trade and Intercourse Act ("Nonintercourse Act"), Act of July 22, 1790, ch. 33, 1 Stat. 137 (1790) (codified as amended at 25 U.S.C. § 177), which prohibits sales of tribal land without the consent of the United States. The case reached the Supreme Court. The Court concluded that because the complaint asserted a current right to possession of the lands that existed as a matter of federal law, the plaintiffs had satisfied the well-pleaded complaint rule: "The claim may fail at a later stage for a variety of reasons; but for jurisdictional purposes, this is not a case where the underlying right or obligation arises only under state law and federal law is merely alleged as a barrier to its effectuation." *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 675 (1974) ("*Oneida I*"). Subsequently, the Court determined in *County of Oneida v. Oneida Indian Nation of New York State*, 470 U.S. 226 (1985) ("*Oneida II*"), that the New York and Wisconsin Oneidas, along with the Oneida of the Thames Band Council (collectively, "the Oneidas"), could maintain a cause of action for violation of their possessory rights to these aboriginal lands based on federal common law. *See Oneida II*, 470 U.S. at 236. In the very decision recognizing that such a cause of action could be maintained, however, the Court noted that "[t]he question whether equitable considerations should limit the relief available to the present day Oneida Indians" had not been addressed and that it expressed "no opinion as to

4

whether other considerations may be relevant to the final disposition of [the] case," which it remanded for further proceedings. *Id*. at 253 n.27. On remand, the district court awarded damages in the amount of $18,970 from Madison County and $15,994 from Oneida County, along with prejudgment interest, for a total judgment of about $57,000. *Oneida Indian Nation of N.Y. v. County of Oneida*, 217 F. Supp. 2d 292, 310 (N.D.N.Y. 2002).

The present case was brought in 1974, but lay dormant for the better part of 25 years while the parties explored settlement and the Oneidas pursued the preceding "test case" on its two separate trips to the Supreme Court. *See City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 209 (2005) (noting that the present litigation, "held in abeyance during the pendency of the test case," resumed only in 2000); *see also Oneida Indian Nation of N.Y. v. New York*, 194 F. Supp. 2d 104, 113 (N.D.N.Y. 2002). The instant case involves the Oneidas' claim not to 872 acres and to two years of rent, but to approximately 250,000 acres of ancestral lands, and to relief going back over two hundred years, to the period between 1795 and 1846 when these lands were conveyed in multiple transactions to the State of New York. During the intervening years from 1974 until today, moreover, a subsequent decision of the Supreme Court, *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, and this Court's decision in *Cayuga Indian Nation v. Pataki*, 413 F.3d 266 (2d Cir. 2005), *cert. denied*, 547 U.S. 1128 (2006), have explored in ways pertinent to our decision here the questions that remained undecided following *Oneida I* and *Oneida II* — namely, whether and in what circumstances equitable principles might limit the relief available to present day Indian tribes deprived of ancestral lands many years ago in violation of federal law.

The Oneidas, along with the United States, which intervened in this litigation in 1998, asserted a variety of claims before the district court. In an order dated May 21, 2007, the United

5

States District Court for the Northern District of New York (Lawrence E. Kahn, *District Judge*), relying principally on this Court's decision in *Cayuga*, granted in part a motion for summary judgment filed by the State of New York and the Counties of Oneida and Madison on the ground that all but one of the plaintiffs' claims were barred by laches. *See Oneida Indian Nation of N.Y. v. New York*, 500 F. Supp. 2d 128, 137 (N.D.N.Y. 2007) ("*Oneida III*"). Based on the Supreme Court's decision in *Sherrill*, *Cayuga* had previously determined that equitable defenses apply to "disruptive" Indian land claims, and that possessory claims — claims premised on the assertion of a continuing right to possession of ancient tribal lands — are by their nature disruptive, in that they call into question settled land titles. *See Cayuga*, 413 F.3d at 274-75. The district court in the present case held that laches barred all the plaintiffs' possessory claims, but that the plaintiffs could proceed against the State of New York alone with what the district court termed a "nonpossessory," contract-based claim for unconscionable consideration in connection with the original land transfers. This Court granted New York's petition pursuant to 28 U.S.C. § 1292(b) for leave to appeal, as well as the cross petitions of the Oneidas and the United States.

Here, the Oneidas and the United States assert primarily that the district court erred in dismissing any of the Oneidas' claims, contending both that this Court's decision in *Cayuga* was incorrectly decided and that, even accepting that *Cayuga* is controlling here, the defendants failed to establish the necessary elements of a laches defense. The United States defends the district court's decision to the extent it permitted plaintiffs to proceed with a "nonpossessory" claim, while at the same time it articulates an alternative claim to that recognized by the district court, grounded

not in federal common law but in the Nonintercourse Act.[1]  Meanwhile, New York State argues principally that the district court erred in permitting a claim to proceed on the theory that New York paid unconscionably inadequate consideration for the subject lands and that reformation of the original agreements to provide for appropriate compensation is an available remedy.  It contends, *inter alia*, that this claim, as well as the alternative claim pressed by plaintiffs on appeal, falls within *Cayuga*'s recognition that equitable considerations bar the adjudication of disruptive Indian land claims.  New York contends, in addition, that its sovereign immunity bars the contract-based claim on which the district court permitted the Oneidas to proceed.

For the reasons articulated below, we conclude that the district court correctly determined that *Cayuga* is controlling here, and that all claims dependent on the assertion of a current possessory interest in the subject lands are barred by equitable defenses.  We further conclude, however, that the purportedly nonpossessory claim identified by that court is also barred, both by New York's sovereign immunity and by the equitable principles applied in *Cayuga*.  In light of *Cayuga*'s holding that equitable defenses apply to disruptive Indian land claims, we finally conclude that the alternative nonpossessory claim articulated on appeal by the plaintiffs, premised on a violation of the Nonintercourse Act, is also barred.

**BACKGROUND**

Because both this Court and the Supreme Court have repeatedly considered this case and other related cases involving the Oneidas, the historical events that form the basis for the plaintiffs' claims have been described extensively elsewhere, including in *Oneida I*, *Oneida II*, *Sherrill*, this

---

[1] The Oneidas assert that both federal common law and the Nonintercouse Act provide a basis for asserting "nonpossessory" claims that are not subject to *Cayuga*'s equitable defense.

7

Court's decision in *Oneida Indian Nation of New York State v. County of Oneida*, 719 F.2d 525 (2d Cir. 1983), *aff'd in part, rev'd in part by Oneida II*, 470 U.S. 226 (1985), and the opinion of the district court below. Accordingly, we outline these events only briefly here, providing a somewhat more extended recounting of the case's procedural history.

The Oneidas are direct descendants of the Oneida Indian Nation, one of six nations of the Iroquois with an aboriginal homeland that "[a]t the birth of the United States . . . comprised some six million acres in what is now central New York." *Sherrill*, 544 U.S. at 203. Under pressure to open this land for settlement in the years after the Revolutionary War, New York State in 1788 concluded the Treaty of Fort Schuyler with the Oneida Indian Nation pursuant to which New York purchased the majority of the Nation's land in New York, leaving the Nation with a reservation of approximately 300,000 acres. *Id*. The legitimacy of this initial transfer is not at issue in the present case. Some two years after the Treaty of Fort Schuyler, the United States Congress enacted the Nonintercourse Act, which "bars sales of tribal land without the acquiescence of the Federal Government." *Id*. at 204.[2] In 1794, the United States entered into the Treaty of Canandaigua, Act

---

[2] The Nonintercourse Act was renewed and revised several times and remains codified today at 25 U.S.C. § 177. The version of the Act in effect in 1793 provided in relevant part:

> [N]o purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution; and it shall be a misdemeanor, in any person not employed under the authority of the United States, in nego[t]iating such treaty or convention, punishable by fine not exceeding one thousand dollars, and imprisonment not exceeding twelve months, directly or indirectly to treat with any such Indians . . . for the title or purchase of any lands by them held, or claimed.

Act of Mar. 1, 1793, ch. 19, § 8, 1 Stat. 329, 330.

of Nov. 11, 1794, 7 Stat. 44, with the six Iroquois nations: "That treaty both 'acknowledge[d]' the Oneida Reservation as established by the Treaty of Fort Schuyler and guaranteed the Oneidas' 'free use and enjoyment' of the reserved territory." *Sherrill*, 544 U.S. at 204-05 (alteration in original) (quoting Treaty of Canandaigua, Art. II, 7 Stat. 45).

Despite the passage of the Nonintercourse Act and the conclusion of the Treaty of Canandaigua, New York continued to purchase land from the Oneida Indian Nation in a series of transactions from 1795 to 1846. *Id*. at 205. The Washington Administration objected to the first of these transactions involving 100,000 acres, but later administrations made no attempt to interfere with New York's continued acquisition of land reserved to the Oneida Nation. *See id*. Indeed, as the Supreme Court recognized in *Sherrill*, "early 19th-century federal Indian agents in New York State did not simply fail to check New York's land purchases, they 'took an active role . . . in encouraging the removal of the Oneidas . . . to the west.'" *Id*. (quoting *Oneida Nation of N.Y. v. United States*, 43 Ind. Cl. Comm'n 373, 390 (1978)). By 1838, six hundred members of the Oneida Nation resided in Wisconsin, while 620 remained in New York State, and the United States was actively pursuing a plan, through the Treaty of Buffalo Creek, to remove all of the remaining New York Oneidas, as well as other New York Indians, to Kansas.[3] *Id*. at 206. "The Oneidas who stayed on in New York . . . continued to diminish in number and, during the 1840's, sold most of their remaining lands to the State." *Id*. at 206-07.

---

[3] The Treaty of Buffalo Creek, which was entered into between the Oneidas and the United States in 1838, "envisioned removal of all remaining New York Indians, including the Oneidas, to Kansas." *Sherrill*, 544 U.S. at 206. "In Article 13 of the . . . Treaty, the Oneidas agreed to remove to the Kansas lands the United States had set aside for them as soon as they could make satisfactory arrangements for New York State's purchase of their lands at Oneida." *Id.* (internal quotation marks and alteration omitted).

The New York and Wisconsin Oneidas first instituted court proceedings seeking recompense in connection with these transactions with New York State in 1951, when they brought suit against the United States pursuant to the Indian Claims Commission Act ("ICCA"), ch. 959, 60 Stat. 1049 (1946). They asserted then that they had received unconscionable compensation in connection with "lands that New York had acquired through 25 treaties of cession concluded between 1795 and 1846," that the United States had breached its fiduciary duty to them under the Nonintercourse Act, and that they should receive the fair market value of the transferred lands. *Sherrill*, 544 U.S. at 207. The Indian Claims Commission determined that the United States in fact had actual or constructive knowledge of these treaties and that it "would be liable if the Oneidas had not received conscionable consideration." *Id*. at 208 (citing *Oneida Nation of N.Y. v. United States*, 43 Ind. Cl. Comm'n 373, 375, 406-07 (1978)). At the request of the New York and Wisconsin Oneidas, however, the case then pending before the Court of Claims was dismissed prior to any determination of the scope of the United States' liability. *Id*. The Court of Claims noted at the time that this was as a result of the plaintiffs' view "that their interests would not be served by obtaining any monetary compensation," and that they "prefer[red] to press litigation . . . seeking a determination that they have present title to the land in New York State . . . ." *Oneida Nation of N.Y. v. United States*, 231 Ct. Cl. 990 (Ct. Cl. 1982) (per curiam).

Commenced by the New York and Wisconsin Oneidas some eight years before they abandoned their case before the Indian Claims Commission, the instant litigation represents the alternative venue in which the Oneidas elected to pursue their claims. As originally pled in 1974, this case sought recompense for the illegal occupation of Oneida land by the Counties of Madison

and Oneida from 1951 onwards.[4] The plaintiffs asserted no claim for unconscionable consideration in connection with the original transfers to New York State and, indeed, could not have done so because New York State was not a party to the litigation and the Counties were not parties to the various sale agreements between New York and the Oneida Indian Nation. After decades during which the suit lay dormant, the United States intervened in the litigation against the Counties in 1998. In 2000, both the original plaintiffs and the United States amended their pleadings to add the Oneida of the Thames as an additional plaintiff and, for the very first time, to name the State of New York as a defendant. Both the Oneidas and the United States also sought to join as defendants 20,000 private landowners. The district court prohibited the assertion of any claims against private landowners, finding: (1) that the Oneidas had acted in bad faith in that for thirty years they "[had] steadfastly maintained that they were *not* seeking to disrupt the current landowners," only to abandon this position in an effort to dispossess these landowners and also to obtain money damages from them; and (2) that the United States had likewise failed to act in good faith by "vacillating on the critical issue of the private landowners' role . . . in this litigation." *Oneida Indian Nation v. County of Oneida*, 199 F.R.D. 61, 81, 87 (N.D.N.Y. 2000).

The district court did permit the Oneidas significantly to amend their complaint against the present defendants to expand both the claims asserted and the scope of the relief sought so that the litigation came to encompass the 250,000-some acres and the 200-plus year history now at issue. The Oneidas filed an amended complaint, noting that it was "filed in accordance with [the district

---

[4] As noted previously, the New York and Wisconsin Oneidas at the time this litigation was initiated were seeking damages from the United States in the Court of Claims proceeding for the period prior to 1951. *See Oneida Indian Nation v. County of Oneida*, 199 F.R.D. 61, 68 (N.D.N.Y. 2000).

11

court's] decision" with regard to the private landowners and therefore was "not a waiver of any rights or claims." Oneida Am. Compl. ¶ 2. As amended, the Oneidas' complaint states that:

> Under Federal common law, the Nonintercourse Act and the Treaty of Canandaigua, Plaintiff Tribes . . . have "possessory rights" in the subject lands . . . and seek, in vindication of those rights, damages for unlawful possession of the subject lands from the time each portion of the subject lands was wrongfully acquired or transferred from the Oneida Indian Nation to the present time; disgorgement of the amounts by which defendants have been unjustly enriched by reason of the illegal taking of the subject lands; an accounting; and a declaration that New York State acquired and/or transferred the subject lands from the Oneida Indian Nation in violation of the Nonintercourse Act and other Federal law and that the purported agreements and letters patent by which the subject lands were acquired or transferred . . . were void ab initio.

*Id.* ¶ 3. The Oneidas' prayer for relief seeks a declaration: (1) that the Oneidas "have possessory rights to the subject lands . . . and there has been no termination of those possessory rights"; (2) that the subject lands were "conveyed unlawfully"; (3) that the various agreements pursuant to which the lands were conveyed "were void ab initio"; (4) that "the subject lands have been in the unlawful possession of trespassers"; and (5) that "all interests of any defendant in the subject lands are null and void." *Id.* at 24. The Oneidas seek injunctive relief "as necessary to restore [them] to possession of those portions of the subject lands to which [the] defendants claim title." *Id.* at 25. They also seek damages: (1) "in the amount of . . . the fair market value of the subject lands, as improved"; (2) in the amount of the lands' fair market rental value from the date of transfer to the present; (3) in an amount equal to the lands' diminution in value due to any extraction of resources or "damage, pollution or destruction" to the property; and (4) in an amount equal to the value of any of these resources, whether taken from the lands by the defendants or those "purporting to act with defendants' permission." *Id.* The Oneidas also seek benefits received by New York State "from its purported purchases and sales of the subject lands," including "the difference in value between the

12

price at which New York State acquired or transferred each portion of the subject lands from the Oneida Indian Nation and its value." *Id.* at 26.

The United States also amended its complaint in 2000. The 2000 United States complaint asserted both a "Federal Common Law Trespass Claim" and a "Trade and Intercourse Claim." U.S. Am. Compl. at 14, 15. In its prayer for relief, the United States sought "damages, including prejudgment interest, against the State of New York as the primary tortfeasor . . . for the trespasses to the Subject Lands that originated with the State's illegal transactions." *Id.* at 16. The United States also sought a determination that the State's "purported acquisitions" of the property violated federal law, that the various agreements pursuant to which these acquisitions took place were void, and an award of appropriate "declaratory relief and/or ejectment" with regard to lands to which New York State and the Counties claimed title. *Id.* The United States amended its complaint again in 2002 to drop its claims against the Counties. In its prayer for relief, the 2002 amended complaint seeks, *inter alia*, a declaratory judgment "that the Oneida Nation has the right to occupy the [subject] lands . . . currently occupied by the State." It seeks "monetary and possessory relief," including ejectment against the State, where appropriate, along with mesne profits or the fair rental value for all the subject lands "from the time when the State attempted to acquire each separate parcel . . . until the present," on the theory that the State "was the initial trespasser . . . and all injury to the Oneida Nation flowed from the State's tortious actions, including the subsequent trespasses by private landowners." U.S. Second Am. Compl. at 14-15. The complaint seeks a judgment against New York "awarding appropriate monetary relief for those lands . . . over which the State no longer retains title or control." *Id.* at 15. It also seeks "such other relief as [the] Court may deem just and proper." *Id.*

13

After the Supreme Court's decision in *Sherrill* and this Court's decision in *Cayuga*, New York and the Counties moved for summary judgment on both the Oneidas' and the United States' claims on the theory that the doctrine of laches precluded them. Noting that the Supreme Court in *Sherrill* had "held that equitable principles barred the New York Oneidas from reasserting tribal sovereignty over land they had purchased that was within the boundaries of the Oneidas' former reservation area," and that this Court had determined in *Cayuga* "that disruptive possessory land claims are subject to the equitable doctrines, specifically laches, applied in *Sherrill*," *Oneida III*, 500 F. Supp. 2d at 131-32, the district court concluded that claims "predicated on [the Oneidas'] continuing right to possess land . . . and seek[ing] relief returning that land and damages based on . . . dispossession" were subject to the laches defense, *id.* at 134. The district court elaborated:

> The Court is compelled to take this action to prevent further disruption: Plaintiffs seek to eject Defendants from their land and obtain trespass damages related to Defendants' unjust possession of the land. . . . [C]laims based on the Oneidas' possessory rights are disruptive to Defendants' rights and might also call into question the rights of tens of thousands of private landowners and their legitimate reliance interests to continue in the undisturbed use and enjoyment of their property. Past injustices suffered by the Oneidas cannot be remedied by creating present and future injustices.

*Id.* at 137. The district court determined, however, that the Oneidas had adequately pled a claim for disgorgement by the State of New York of the difference in value between the price at which New York acquired the subject lands pursuant to the twenty-six agreements at issue and the lands' value at the time of these transactions. The court determined that this claim "[was] best styled as a contract claim that seeks to reform or revise a contract that is void for unconscionability" and determined that such a claim was not disruptive because it "only seeks retrospective relief in the form of damages, is not based on Plaintiffs' continuing possessory right to the claimed land, and does not void the agreements," but rather reforms them "through an exercise of [the court's]

14

equitable power[s]." *Id.* at 140. Accordingly, the court granted the defendants' motion in part and denied it in part, noting that its decision "permits the Oneidas to reform and revise the twenty-six (26) agreements with the State and to receive fair compensation for lands transferred by their ancestors." *Id.* at 147. The instant appeal and cross appeal followed.

**DISCUSSION**

At the start, both the Oneidas and the United States urge us to repudiate this Court's earlier decision in *Cayuga*. This we cannot do. This panel is bound to adhere to the earlier precedent of this Court in the absence of a decision by the Supreme Court or an *en banc* panel of this Court calling that precedent into question. *See Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 274 (2d Cir. 2005). Nothing of the sort has occurred here. Accordingly, we must and we will follow *Cayuga* to the extent it is controlling. We thus begin with the Supreme Court's decision in *Sherrill* and this Court's decision in *Cayuga*, which explained *Sherrill*'s import for the proper adjudication of ancient tribal land claims. We then proceed to consider both the possessory claims dismissed by the district court on the authority of *Cayuga* and the purportedly nonpossessory claims that plaintiffs contend they are entitled to pursue.

**I. *Sherrill* and *Cayuga***

This Court's decision in *Cayuga*, upon which the district court relied in dismissing the bulk of the plaintiffs' claims, was itself based on the Supreme Court's 2005 decision in *Sherrill*, which the *Cayuga* panel found fundamentally to have changed the background legal standards for assessing ancient tribal land claims. *Cayuga*, 413 F.3d at 273. *Sherrill* involved about 17,000 acres scattered throughout the Counties of Madison and Oneida that were once part of the plaintiffs' ancestral lands and that were purchased on the open market by the New York Oneidas in 1997 and 1998. The New

York Oneidas, citing *Oneida II*, argued that upon reacquiring this land, which represented less than 1.5% of the Counties' total area, the Oneida Indian Nation's ancient sovereignty over each individual parcel was revived, barring the City of Sherrill or the Counties of Madison and Oneida from requiring the plaintiffs to pay property taxes. The New York Oneidas sought equitable relief in the form of a declaration "prohibiting, currently and in the future, the imposition of property taxes" on the lands they had reacquired. *Sherrill*, 544 U.S. at 212. The Court determined that such relief could not be granted:

> [W]e decline to project redress for the Tribe into the present and future, thereby disrupting the governance of central New York's counties and towns. Generations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation. And at least since the middle years of the 19th century, most of the Oneidas have resided elsewhere. Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the Oneidas' long delay in seeking judicial relief against parties other than the United States, we hold that the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders.

*Id*. at 202-03.

The Court addressed a number of factors in reaching this conclusion. Although the United States appeared as amicus curiae on behalf of the New York Oneidas in *Sherrill*, the Supreme Court noted that "[f]rom the early 1800's into the 1970's, the United States largely accepted, or was indifferent to, New York's governance of the land in question and the validity *vel non* of the Oneidas' sales to the State." *Id*. at 214. Indeed, national policy through much of the early 1800's "was designed to dislodge east coast lands from Indian possession." *Id*. at 214-15. The Court found it relevant that the Oneidas "did not seek to regain possession of their aboriginal lands by court decree until the 1970's" and that the Oneidas for generations had predominantly sought relief "not

16

[from] New York or its local units" but from the United States. *Id*. at 216, 219 n.12. During this long lapse of time, the properties had greatly increased in value and there had been dramatic changes in their character. *Id*. at 216-17. The Court recognized the "disruptive practical consequences" that would flow from "[a] checkerboard of alternating state and tribal jurisdiction in New York State — created unilaterally at [the plaintiffs'] behest." *Id*. at 219-20. Evoking the doctrines of laches, acquiescence, and impossibility, the Court concluded that equitable considerations — considerations arising out of the Oneidas' long delay in seeking relief, the attendant development of justified societal expectations relating to the governance of the lands in question, and the potential of the sought-after relief to disrupt those expectations — precluded the Oneidas from obtaining their sought-after declaration. *See id*. at 214-21.

This Court concluded shortly after *Sherrill* was decided that because its claims were likewise "indisputably disruptive," the Cayuga Indian Nation was barred by similar equitable considerations from seeking recompense for the ancient deprivation of its ancestral lands, even though these claims, unlike those in *Sherrill*, sounded primarily in law rather than equity, and even though only money damages were at issue. *Cayuga*, 413 F.3d at 275. *Cayuga* involved the Cayuga Indian Nation's claim to 64,015 acres of land that were ceded to New York in 1795 and 1807, allegedly in violation of both the Nonintercourse Act and the Treaty of Canandaigua. The Cayugas sought, *inter alia*, both ejectment of the current residents and trespass damages. The district court ruled in favor of the plaintiffs on liability, but determined that ejectment was not a proper remedy and thereafter conducted a jury trial on damages; the damages were limited to the fair market value of the property at the time of trial in 2000 and to fair rental value damages from 1795 to 1999. The trial resulted

17

in a verdict against New York State that, with prejudgment interest, totaled $247,911,999.42.[5]

On appeal, this Court determined that since the district court's rulings in *Cayuga*, *Sherrill* had "dramatically altered" the legal landscape against which ancient tribal land claims should be considered: "We understand *Sherrill* to hold that equitable doctrines, such as laches, acquiescence, and impossibility, can, in appropriate circumstances, be applied to Indian land claims, even when such a claim is legally viable and within the statute of limitations." *Id*. at 273. The Court concluded that *Sherrill*'s concern with the New York Oneidas' claim had been with "the disruptive nature of the claim itself," and that, accordingly, the equitable defenses invoked in *Sherrill* apply, not narrowly to claims seeking a revival of sovereignty, but to "'disruptive' Indian land claims more generally," *id*. at 274, whether such claims are legal or equitable in character, *see id*. at 276, and whether or not the remedy sought is limited to an award of money damages, *see id*. at 274. The Court concluded that the doctrine of laches barred the Cayugas' claims, which it characterized as "possessory claims" that were by their nature disruptive in that they called into question settled land titles over a "large swath of central New York State." *Id*. at 275. With regard specifically to the ejectment claim, the Court observed that "[t]he fact that, nineteen years into the case, at the damages stage, the District Court substituted a monetary remedy for plaintiffs' preferred remedy of ejectment cannot salvage the claim, which was subject to dismissal *ab initio*." *Id*. at 277-78 (footnote omitted). As for the trespass claim, the Court said, it "is predicated entirely upon plaintiffs' possessory land

---

[5] The United States successfully intervened in the *Cayuga* litigation in November 1992, so that notwithstanding New York's sovereign immunity, the Cayugas were not barred from bringing claims against the State of New York identical to those brought by the United States. *Cayuga*, 413 F.3d at 270-71. In 1999, the district court ruled that the State of New York "could be deemed an original or primary tortfeasor," responsible for the allegedly unlawful occupation of the subject land by third parties, and the district court thereafter elected to proceed with the case with New York as the sole defendant. *Id*. at 271-72.

18

claim" and "because plaintiffs are barred by laches from obtaining an order conferring possession in ejectment, no basis remains for finding such constructive possession or immediate right of possession as could support [trespass] damages." *Id*. at 278. The Court reversed the judgment of the district court in favor of the Cayugas and ordered judgment entered for the defendants.

## II. The Oneidas' Possessory Land Claims

### A. *Cayuga*'s Import

The district court determined here that the plaintiffs "assert a current possessory interest in the land" and that their claims, to the extent premised on such an interest, are subject to the equitable considerations at issue in *Cayuga. Oneida III*, 500 F. Supp. 2d at 133. "Plaintiffs," the district court observed, "assert certain claims predicated on their continuing right to possess land . . . and seek relief returning that land and damages based on their dispossession." *Id*. at 134. The court concluded that "[t]he Second Circuit has held that a laches defense does apply to 'indisputably disruptive' possessory land claims, like those brought by the Cayugas and Plaintiffs in the instant case," and that it was "required to find Plaintiffs' possessory land claims are subject to the defense of laches." *Id*. We agree.

With regard to the claims that the Oneidas alone assert against Madison and Oneida Counties, each one of these claims is a "possessory" claim of the sort found potentially subject to equitable bar in *Cayuga*. The Oneidas assert that the Counties have "unlawfully possessed the subject lands," excluding the Oneidas from their rightful possession; that they have "kept and continued to keep [the Oneidas] out of possession"; and that they have "severed attachments such as minerals, crops, timber and other valuable resources from the land without authority to do so." Oneida Am. Compl. ¶¶ 55-56, 59. The Oneidas seek, *inter alia*, "damages in the amount of the fair

19

market value of the subject lands," and damages representing "the fair market rental value of the subject lands" and "the value of all minerals and other resources taken from the subject lands." Each of these claims, whether asserting violations of federal common law, the Nonintercourse Act, or the Treaty of Canandaigua, sounds either in ejectment, trespass, or a related theory of injury derived from the Oneidas' claimed right to possession of the lands.[6] Indeed, the Counties were not parties to the various sale agreements between New York and the Oneidas, and thus the only claims *available to be asserted* against them relate to their alleged unlawful occupation of the subject lands in derogation of the Oneidas' superior possessory interest. Such claims, premised on the Oneidas' continuing right of possession, fall within *Cayuga*'s holding that equitable defenses "apply to possessory land claims of this type." *Cayuga*, 413 F.3d at 276.

This much is clear from even the most cursory reading of *Cayuga*. *Cayuga* expressly concluded that "possessory land claims" — any claims premised on the assertion of a current, continuing right to possession as a result of a flaw in the original termination of Indian title — are by their nature disruptive and that, accordingly, the equitable defenses recognized in *Sherrill* apply to such claims. *See id.* at 274-75 (determining claim seeking award of current market value of subject lands to be merely a "monetized" form of a claim "assert[ing] a continuing right to immediate possession" (internal quotation marks omitted)); *id.* at 278 (indicating that claim seeking award of past rental value based on a trespass theory is subject to equitable defense because "there can be no trespass unless the [plaintiffs] possessed the land in question" and such a claim "is based

---

[6] *Cayuga* recognized, correctly, that a claim sounds in ejectment even when the ejectment remedy is "effectively monetized," since the "substitut[ion] [of] a monetary remedy for plaintiffs' preferred remedy of ejectment" does not alter the character of a claim asserting a present right to possession and "subject to dismissal *ab initio*." *Cayuga*, 413 F.3d at 277-78.

on a violation of their constructive possession"). As the district court in this case determined, *Cayuga* "concluded that this type of claim is inherently disruptive because it seeks to overturn years of settled land ownership." *Oneida III*, 500 F. Supp. 2d at 133. Here, the claims against Madison and Oneida Counties and the relief sought from these defendants are effectively *identical to* the claims and relief sought in *Cayuga*, in which the plaintiffs sought both the current fair market value of the subject lands as an alternative remedy to injunctive relief sounding in ejectment, and rental damages from 1795 to 1999 sounding in trespass. *See Cayuga*, 413 F.3d at 276, 278. Accordingly, the claims against Madison and Oneida Counties are subject to the defense recognized by this Court in *Cayuga*.

The same perforce holds true for the identical claims sounding in ejectment, trespass, or related "possessory" theories of injury brought against New York State by both the Oneidas and the United States. The district court rightly noted that this Court "was very clear in *Cayuga*: Indian possessory land claims that seek or sound in ejectment of the current owners are indisputably disruptive and would, by their very nature, project redress into the present and future; such claims are subject to the doctrine of laches." *Oneida III*, 500 F. Supp. 2d at 136. In *Cayuga*, the Court concluded with regard to such claims that "the import of *Sherrill* is that 'disruptive,' forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches." *Cayuga*, 413 F.3d at 277. This is true even when such claims are "legally viable and within the statute of limitations," *id.* at 273, when the relief sought is limited to monetary damages, and when the disruptive claims sound at law rather than in equity, *id*. at 273-75. Indeed, the United States acknowledges in its brief before this Court that *Cayuga* "held that requests for money damages grounded on the asserted right to possess the land at issue," including the plaintiffs'

21

Nonintercourse Act claim, to the extent predicated on such a right, are subject to the laches defense. U.S. Br. at 31. The United States contends that "[this] holding was in error for several reasons," *id.*, but as noted earlier this question is not properly before us, and we do not address it.

## B. The Applicability of Laches

The plaintiffs next argue that even if the equitable considerations relevant in *Cayuga* are also applicable here, the defendants have nevertheless failed to establish the elements of a laches defense, so the plaintiffs' possessory claims may still proceed. The United States argues, in addition, that it is not subject to laches when acting in its sovereign capacity and that the district court therefore erred in applying laches against it. For the reasons that follow, we disagree.

This matter is indistinguishable from *Cayuga* in terms of the underlying factual circumstances that led the *Cayuga* court to conclude not only that the laches defense and other equitable defenses were available, but also that laches actually barred the claims at issue in that case. Here, as in *Cayuga*, a tremendous expanse of time separates the events forming the predicate of the ejectment and trespass-based claims and their eventual assertion. In that time, most of the Oneidas have moved elsewhere, the subject lands have passed into the hands of a multitude of entities and individuals, most of whom have no connection to the historical injustice the Oneidas assert, and these parties have themselves both bought and sold the lands, and also developed them to an enormous extent. These developments have given rise to justified societal expectations (expectations held and acted upon not only by the Counties and the State of New York, but also by private landowners and a plethora of associated parties) under a scheme of "settled land ownership" that would be disrupted by an award pursuant to the Oneidas' possessory claims. *See Cayuga*, 413 F.3d at 275. By *Cayuga*'s logic, moreover, this is true no matter what specific relief such an award

22

would entail, whether actual ejectment, damages for ongoing trespass liability, or, instead, payment of the fair market value of the property in a single lump sum. As the Court in *Cayuga* concluded, "disruptiveness is inherent in the claim itself — which asks this Court to overturn years of settled land ownership — rather than [being] an element of any particular remedy which would flow from the possessory land claim." *Id.*

We have used the term "laches" here, as did the district court and this Court in *Cayuga*, as a convenient shorthand for the equitable principles at stake in this case, but the term is somewhat imprecise for the purpose of describing those principles. As *Cayuga* recognized, "[o]ne of the few incontestable propositions about this unusually complex and confusing area of law is that doctrines and categorizations applicable in other areas do not translate neatly to these claims." *Id.* at 276. The Oneidas assert that the invocation of a purported laches defense is improper here as the defendants have not established the necessary elements of such a defense. It is true that the district court in this case did not make findings that the Oneidas unreasonably delayed the initiation of this action or that the defendants were prejudiced by this delay — both required elements of a traditional laches defense. *See Costello v. United States*, 365 U.S. 265, 282 (1961) ("Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."); *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004) ("A party asserting the equitable defense of laches must establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay." (internal quotation marks omitted)). This omission, however, is not ultimately important, as the equitable defense recognized in *Sherrill* and applied in *Cayuga* does not focus on the elements of traditional laches but rather more generally on the length of time at issue between an historical

23

injustice and the present day, on the disruptive nature of claims long delayed, and on the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury.

In *Sherrill*, the Supreme Court concluded that "standards of federal Indian law and federal equity practice" barred the New York Oneidas from obtaining declaratory and injunctive relief that would have exempted them from state property taxation for former reservation lands recently reacquired through market transactions. *Sherrill*, 544 U.S. at 214 (internal quotation marks omitted). More specifically, the Court determined that the tremendous expanse of time that had passed between the initial, allegedly unlawful transactions and the eventual initiation of the action at issue, as well as the intervening economic and regulatory development of the subject lands, had given rise to justifiable societal expectations that would be disrupted by that remedy. *See id.* at 221 ("[T]he distance from 1805 [when the land at issue was transferred] to the present day, the [plaintiff's] long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations . . . render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate."); *see also id.* at 215-16 (noting the existence of "justifiable expectations, grounded in two centuries of New York's exercise of regulatory jurisdiction"); *id.* at 219-20 (discussing the possibility for the disruption of such expectations were the plaintiffs to be granted the remedy sought). The Supreme Court discussed laches not in its traditional application but as one of several preexisting equitable defenses, along with acquiescence and impossibility, illustrating fundamental principles of equity that precluded the plaintiffs "from rekindling embers of sovereignty that long ago grew cold." *Id.* at 214; *see also id.* at 217-20 (finding support for the conclusion that the plaintiff's claim was barred by equitable considerations in the three preexisting

24

defenses of laches, acquiescence, and impossibility); *see also id.* at 221 (noting that the relevant equitable considerations "evoke the doctrines of laches, acquiescence, and impossibility"). Moreover, the Supreme Court made no mention of unreasonable delay by the New York Oneidas, as distinguished from delay alone, or prejudice to the particular defendants, as opposed to the disruption of broader societal expectations. *Sherrill*, then, did not involve the application of a traditional laches defense so much as an equitable defense that drew upon laches and other equitable doctrines but that derived from general principles of "federal Indian law and federal equity practice." *Id.* at 213.

This Court's analysis in *Cayuga* was similar. Although the *Cayuga* court, like the district court in this case, employed the term "laches" to describe the defense upon which its decision rested, *see Cayuga*, 413 F.3d at 277, it also expressly indicated that it based its conclusion on the same reasoning that the Supreme Court had employed in *Sherrill*, *see id.* at 275 ("[W]e conclude that possessory land claims of this type are subject to the equitable considerations discussed in *Sherrill*."). Additionally, when the *Cayuga* court, after concluding that the claims asserted by the plaintiff in that case were subject to the *Sherrill* defense, addressed the subsidiary question whether those claims were thereby barred, it considered only factors equivalent to those addressed in *Sherrill*, *see id.* at 277, and, indeed, rejected the Cayugas' contention that their claims were barred only if the elements of a traditional laches defense were met, *see id.* at 279-80 (concluding that a finding of no unreasonable delay did not preclude the conclusion that plaintiffs' claims were nevertheless barred in light of, *inter alia*, "the Supreme Court's ruling in *Sherrill*," *id.* at 280). The United States contends that *Cayuga* "wrongly altered the traditional laches analysis by making any inquiry into unreasonable delay irrelevant." U.S. Br. at 38. We conclude, in contrast, that *Cayuga* applied not

25

a traditional laches defense, but rather distinct, albeit related, equitable considerations that it drew from *Sherrill*. Either way, we are bound by *Cayuga* and therefore reject the Oneidas' and United States' contention that the district court erred by failing to consider the elements of a traditional laches defense.

Finally, the intervention of the United States on behalf of the Oneidas does not change this outcome. Although the United States is traditionally not subject to delay-based equitable defenses under most circumstances, *see, e.g., United States v. Summerlin*, 310 U.S. 414, 416 (1940), *Cayuga* expressly concluded that the United States *is* subject to such defenses under circumstances like those presented here (*i.e.*, a lengthy delay in asserting the relevant cause of action, the absence of an applicable statute of limitations for the great majority of this delay, and an intervention to vindicate the interests of an Indian nation). Indeed, on facts virtually indistinguishable from those here, the *Cayuga* court concluded that "whatever the precise contours of the exception to the rule against subjecting the United States to a laches defense, this case falls within the heartland of the exception." *Cayuga*, 413 F.3d at 279.[7] Although the United States contends that this holding was in error, *see* U.S. Br. at 20, this argument is not properly before us and we do not consider it, instead adhering faithfully to *Cayuga*. *See Sullivan*, 424 F.3d at 274.

### III. The "Nonpossessory" Claims

Our conclusion that the district court properly applied the equitable principles recognized

---

[7] The dissent argues that *Cayuga* is distinguishable in that the United States here is acting not only on behalf of the Oneidas, but to assert its own interest in the vindication of a federal statute. In *Cayuga*, however, the United States also asserted that the initial transfers of land from the Cayuga Indian Nation had violated the Nonintercourse Act, U.S. Compl. in Intervention ¶¶ 8, 10-11, *Cayuga*, 413 F.3d 266, and the dissent's purported distinction therefore cannot serve as a basis for declining to find *Sherrill*'s equitable defense applicable to the United States in this case.

in *Sherrill* and *Cayuga* to the possessory claims asserted by the Oneidas and by the United States does not end our inquiry. The district court also determined that although claims based on the Oneidas' possessory rights to the subject lands were disruptive and therefore barred by laches, the Oneidas had "allege[d] facts necessary to assert non-possessory claims" against New York State alone. *Oneida III*, 500 F. Supp. 2d at 139. The district court permitted the Oneidas to proceed with regard to one such claim. The plaintiffs press another on appeal. We begin by laying out with specificity each claim now before us.

First, the district court, broadly construing the Oneidas' complaint, discerned in it a common law "contract" claim — a different claim from any before considered by the Supreme Court, this Court, or the district court itself in this litigation's thirty-year history — premised on the assertion that the Oneidas received unconscionable consideration in the original transactions with New York State. The remedy for this alleged wrong, the district court concluded, is the reformation of the challenged agreements. *Id.* at 140. The district court determined that this claim was not barred by laches:

> Plaintiffs claim that the State inadequately compensated the Oneida Indian Nation for land transferred to it. This claim is best styled as a contract claim that seeks to reform or revise a contract that is void for unconscionability. This type of contract claim is not disruptive. . . . [T]he Court would reform the agreements through an exercise of its equitable power, which implicitly recognizes and confirms the transfer of property made pursuant to the agreements subject to attack. Therefore, Plaintiffs may pursue this cause of action while conforming to the Circuit's mandate in *Cayuga* that Defendants' settled expectations not be disrupted.

*Id.* The court determined that the Oneidas, to prevail on this "unconscionable consideration" claim, would need to establish either (1) "the inadequacy of consideration . . . coupled with evidence of the inferiority of the Oneida Indian Nation's negotiating position, which can be established by evidence demonstrating that the State deceived or misled Plaintiffs as to the value of the land or had

27

knowledge of any fact bearing upon its value that was not well known by Plaintiffs"; or (2) "the gross inadequacy of the consideration received . . . in comparison to the fair market value of the land such that it is unnecessary for Plaintiffs to make any additional showing regarding the State's actions or knowledge." *Id.* at 144. Notably, the district court grounded this claim in federal common law, not in any violation of the Nonintercourse Act. *See id.* at 138-39 & n.4, 140.

The plaintiffs on appeal, while generally supporting the district court's conclusion that a purportedly nonpossessory claim may proceed, focus principally on a fundamentally different claim from the one recognized by the district court. The United States contends that a finding that the challenged land transactions violated the Nonintercourse Act is in and of itself sufficient to support a damages award.[8] Contending that the Act protects not only against the unauthorized sale of Indian lands but that it also seeks to assure that any such sales that do take place are not "unfair," the United States asserts that "claims that seek fair compensation for the land" as a form of restitution "(rather than recovery of possession) are . . . appropriate" under the Act.[9] U.S. Br. at 53, 56. The United States further contends that the restitutionary remedy should include not only fair compensation but also disgorgement of all profits realized by the State of New York through its transactions in the subject lands. The district court concluded such a claim, seeking a damages

---

[8] To reiterate, the version of the Nonintercourse Act in effect in 1793 provided in relevant part that "[N]o purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, *shall be of any validity in law or equity*, unless the same be made by a treaty or convention entered into pursuant to the constitution." 1 Stat. at 330 (emphasis added).

[9] The Oneidas, while supporting the district court's conclusion that a nonpossessory, contract-based claim premised on federal common law may proceed, also articulate as an alternative a "fair compensation" claim grounded in New York's alleged violation of the Nonintercourse Act.

28

award in lieu of the return of unlawfully transferred property, is predicated on the Oneidas' right to possess the subject lands and is thus barred under the principles of *Cayuga*:

> The Circuit's reasoning [in *Cayuga*] suggests that any award of damages that is predicated on possession of the land in question, however remotely, is too disruptive and must be barred by laches. Plaintiffs' and the United States' reliance on the Court's equitable powers to compensate them for the loss of land necessarily implicates the Oneidas' historical claim to the land in question.

*Oneida III*, 500 F. Supp. 2d at 144 n.8. The court concluded that its contract claim, in contrast, "does not rely on any present or future claim to the land in question and [thus] does not run afoul of the *Cayuga* court's decision." *Id.*

The State of New York urges us to conclude that *each* of the above-described claims is similarly disruptive and accordingly subject to *Cayuga*'s equitable defense. New York also contends, *inter alia*, that its sovereign immunity prevents the Oneidas from proceeding on the common law contracts-based claim, which New York asserts is not to be found in the United States' complaint. We conclude, for the reasons stated below, that the contract-based claim articulated by the district court is barred by New York's sovereign immunity. We agree with New York, moreover, that the equitable considerations in *Cayuga* are implicated by the plaintiffs' purportedly nonpossessory claims and that these considerations likewise prevent such claims from going forward.

**A. New York's Sovereign Immunity Bars the Oneidas' "Contract" Claim**

We begin with first principles. It is well established that "the States entered the federal system with their sovereignty intact," and that this sovereignty limits the "judicial authority in Article III" unless the states have "consented to suit" in court, "either expressly or in the plan of the convention." *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991) (internal quotation

29

marks omitted); *see also Principality of Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934).  It is also well established that in entering the federal union, the states implicitly gave consent to suits by the United States, *see, e.g.*, *Alden v. Maine*, 527 U.S. 706, 755 (1999); *Principality of Monaco*, 292 U.S. at 329; *cf. United States v. Minnesota*, 270 U.S. 181, 195 (1926) ("The reason the Indians could not bring the suits . . . lies in the general immunity of the state . . . from suit in the absence of consent.  Of course, the immunity of the state is subject to the constitutional qualification that she may be sued in this Court by the United States . . . ."), but not to suits against states by Indian tribes, *see Blatchford*, 501 U.S. at 781 (finding no "compelling evidence" to suggest that consent to suit by Indian tribes was "inherent in the constitutional compact").

The Supreme Court determined in *Arizona v. California*, 460 U.S. 605 (1983), a dispute among several states concerning their claims to the waters of the Colorado River, that because the United States had intervened in the action to assert water rights claims on behalf of Indian tribes, the intervention of the tribes themselves did not infringe the states' sovereign immunity.  *See Arizona*, 460 U.S. at 614.  Significantly, however, the tribes intervening in *Arizona* did not "seek to bring new claims or issues against the states" other than those already asserted by the United States.[10]  *Id.*  The Court recently reaffirmed the continuing validity of *Arizona*, but again suggested that the case only applies when a private party asserts "an entirely overlapping claim" to one properly before the court, and only when the overlapping claim would "burden[] the State with no

---

[10] The Indian tribes in *Arizona* initially sought greater relief than did the United States but the United States ultimately "joined the Indians in moving for a supplemental decree to grant additional water rights to the reservation." *Arizona*, 460 U.S. at 612.

additional defense or liability." *Alabama v. North Carolina*, 130 S. Ct. 2295, 2315 (2010).[11]

Relying on *Arizona*, we also have approved the denial of an Eleventh Amendment defense in a case in which an Indian tribe sued New York State and the United States intervened in the action seeking the same relief. *See Seneca Nation of Indians v. New York*, 178 F.3d 95 (2d Cir. 1999) (per curiam), *aff'g* 26 F. Supp. 2d 555 (W.D.N.Y. 1998). We again emphasized, however, that "the State of New York retains its Eleventh Amendment immunity to the extent that the [plaintiff Indian tribes] raise claims or issues that are not *identical to* those made by the United States." *Seneca Nation*, 178 F.3d at 97 (emphasis added); *see also Seneca Nation of Indians v. New York*, 26 F. Supp. 2d at 560 (noting that the United States' complaint in intervention sought "the identical relief as the Senecas' [complaint]"); *accord Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904, 912-13 (8th Cir. 1997) (rejecting Minnesota's sovereign immunity defense when United States intervened in Indian tribes' suit seeking the same relief as sought by the tribes in the underlying action). This is consistent with the Supreme Court's admonition that "[a] federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment."

---

[11] *Alabama v. North Carolina* involved a suit within the Supreme Court's original jurisdiction against North Carolina by a number of states and a private interstate commission relating to an interstate compact. *Alabama*, 130 S. Ct. at 2302-05. The special master preliminarily recommended denying North Carolina's motion to dismiss the claims of the commission, which, the state argued, were barred by its sovereign immunity. *Id.* at 2314. The master relied on *Arizona*, noting that the other plaintiffs — all sovereign states — were also bringing claims against North Carolina and it was too early in the litigation to tell whether the commission's claims were "the same claims . . . seek[ing] the same relief as the other plaintiffs." *Id.* The Court noted that, with respect to two of the commission's claims, the commission's ability to sue derived entirely from its ability to represent the states' interests created by the interstate compact. *Id.* at 2315. With respect to the commission's remaining three claims, the Court noted that "while the Commission again seemingly makes the same claims and seeks the same relief as the States, it is conceivable that as a matter of law the Commission's claims are not *identical*." *Id.* at 2316 (emphasis added). Therefore it was appropriate to "defer" the sovereign immunity question with respect to these claims until they were further clarified. *Id.*

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).

We need not address here the precise contours of when a tribe's complaint raises a claim or issue not "identical to" one asserted by the United States, because even construing the United States' most recent amended complaint liberally, it simply does not contain the contract-based claim that the district court found to be adequately pled by the Oneidas. The United States admits before this Court that while a complaint need not specify the legal theory underlying its claims, it must set forth "those facts necessary to a finding of liability." *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 343 (2d Cir. 2006) (emphasis omitted). Here, the United States' complaint alleges no facts whatsoever regarding essential aspects of a contract-based claim — that the consideration the Oneidas received for the subject lands was inferior or grossly inferior to the lands' fair market value, that New York deceived or misled the Oneidas as to the value of the land, or that New York had knowledge of any fact bearing on the value of the land that was not known by the Oneidas themselves. *See Oneida III*, 500 F. Supp. 2d at 144 (describing facts required to be established to prevail on the district court's contract-based claim). Although the United States' amended complaint refers in one instance to the alleged profits the State made on its sales of the lands at issue, U.S. Second Am. Compl. ¶ 18, it is clear from the complaint's description of the nature of the action, the facts of the land transfers, the claims asserted, and the "prayer for relief" that the United States asserts predominantly, if not exclusively, trespass and ejectment-based claims.[12]

---

[12] *See, e.g.*, U.S. Second Am. Compl. ¶ 1.b (indicating that "[b]ecause [New York's purchases of the subject lands] violated the Trade and Intercourse Act, the State of New York failed to extinguish the Oneida Nation's *right to possess the Subject Lands* under federal law"); *id.* ¶ 2 ("The United States seeks monetary and other relief from . . . New York for its denial of the Oneida Nation's *enjoyment of its rights to the Subject Lands* under federal law and for the *trespasses to the Subject Lands* that originated with the State's illegal transactions."); *id.* ¶ 8 ("The United States has intervened in this action as plaintiff to enforce federal law, namely, the

32

Even if the United States' complaint is deemed to allege a purportedly nonpossessory claim, moreover, it is clear that any such claim in the complaint is based entirely on the Nonintercourse Act. The United States' complaint asserts two claims against New York — a "Federal Common Law Trespass Claim" and a "Trade and Intercourse Claim." The former claim appears to ground its cause of action in both the Nonintercourse Act and federal common law but, as a claim for trespass, is clearly possessory. *See id.* ¶ 24; *Cayuga*, 413 F.3d at 278 ("[T]he trespass claim . . . is predicated entirely upon plaintiffs' possessory land claim, for the simple reason that there can be no trespass unless the Cayugas possessed the land in question."). The latter claim, grounded only in the allegation that the original land transactions violated the Nonintercourse Act, is therefore the only potential source of a nonpossessory claim. But the district court did not derive the Oneidas'

*restrictions on alienation* set forth in the Trade and Intercourse Act . . . ; to enforce the provisions of the Treaty of Canandaigua of 1794, . . . to which the United States was a party; and to protect the treaty-recognized rights of the Oneida Nation."); *id.* ¶ 13 (noting that the Treaty of Canandaigua gave the Oneida Nation "the right to occupy the Subject Lands and guaranteed the . . . free and undisturbed use of the land"); *id.* ¶ 14 (noting that the Nonintercourse Act "expressly forbade and *declared invalid any sale of land*, or any title or claim thereto, by any Indian Nation . . . without the approval and ratification of the United States"); *id.* ¶ 16 ("[E]ach of the above-mentioned agreements was *illegal and void ab initio* under the Nonintercourse Act."); *id.* ¶ 18 ("After each of its purported acquisitions . . . New York *wrongfully asserted control and/or possession* of . . . the Subject Lands."); *id.* ¶ 19 ("New York State *unlawfully retains possession* . . . ."); *id.* ¶¶ 22-24 (describing "Claim I: Federal Common Law Trespass Claim," premised on past and continuing violations of the Oneidas' possessory rights); *id.* ¶¶ 25-26 (describing "Claim II: Trade and Intercourse Claim," premised on fact that "New York State *asserted control and assumed possession* of the Subject Lands[,] . . . continues to assert control and possession of some of the Subject Lands," and "purport[ed] to sell or otherwise grant the Subject Lands to third parties," causing "Third Party *Trespasses*"); *id.* at 14 ("Prayer for Relief," requesting (1) a declaratory judgment that the Oneida Nation "has *the right to occupy the lands* described in this complaint"; (2) "a judgment awarding *monetary and possessory relief, including ejectment where appropriate*"; (3) a judgment awarding "*mesne profits or fair rental value* for the entire Claim Area," on the grounds that New York was "*the initial trespasser*"; (4) a judgment "awarding appropriate monetary relief" for lands no longer occupied by the State, also on the grounds that it was "*the initial trespasser*"; (5) attorneys fees and costs; (6) "such other relief as this Court may deem just and proper") (emphasis added throughout).

33

purportedly nonpossessory claim from the Nonintercourse Act; rather, the "fair compensation" claim is based on an entirely different theory — that the Oneidas possess a *common law* right of action sounding in contract to reform land sale agreements that were supported, they allege, by unconscionable consideration. *See Oneida III*, 500 F. Supp. 2d at 140-41 & n.6; *see also id.* at 139 n.4 (indicating that "a claim predicated on a violation of the Nonintercourse Act . . . might also be appropriate," but declining to consider such a claim).

The United States suggests that we may consider its pleadings "constructively amended" to include the nonpossessory "contract" claim brought by the Oneidas and recognized by the district court because the issue was litigated below. Constructive amendment, when used by appellate courts, is a "judicially created" discretionary doctrine that we have used "extremely sparing[ly]" to recognize that an issue not in the parties' pleadings was actually litigated in the court below. *City of Rome, N.Y. v. Verizon Commc'ns, Inc.*, 362 F.3d 168, 181 (2d Cir. 2004). "When issues that were not raised in the pleadings are tried *by express or implied consent of the parties*, this consent acts to permit what is in effect a constructive amendment of the pleadings to include those issues." *Walton v. Jennings Cmty. Hosp., Inc.*, 875 F.2d 1317, 1320 n.3 (7th Cir. 1989) (emphasis added) (internal quotation marks omitted). Here, however, New York never consented, expressly or otherwise, to the litigation of any nonpossessory claims, and certainly not to the claim as formulated by the district court; indeed, it vigorously contended before the district court that neither the Oneidas nor the United States had asserted such a claim in their complaints. *See, e.g.*, Def.'s Reply Mem., Doc. 606 (Mar. 2, 2007), at 2-8 & n.3.[13] Although the district court rejected this argument and found

---

[13] The United States and Judge Gershon in dissent note that New York described the Oneidas' and United States' complaints as "parallel" in its summary judgment briefing below. The State meant, however, only that both complaints asserted the Oneidas' right to *possess* the

that the Oneidas' complaint alleged a nonpossessory claim, *see Oneida III*, 500 F. Supp. 2d at 139-40, this does not alter the fact that New York did not in any way consent to the litigation of any such nonpossessory claims such that we may consider the United States' complaint constructively amended. *Cf.* 6A Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §1494 (3d ed. 2010) ("[I]f the issue in fact has not been tried with the consent of the parties, then an amendment to conform to the pleadings will not be permitted no matter when made."); *Wahlstrom v. Kawasaki Heavy Indus., Ltd.*, 4 F.3d 1084, 1087 (2d Cir. 1993) (although plaintiffs could not state a claim under state tort law, *defendants* had argued before district court that federal maritime law governed the claim at issue, and parties had litigated whether relief was available under maritime law; thus complaint could be constructively amended to assert a maritime law claim).

Finally, we note that the United States in its brief before this Court does not even defend the contract claim as articulated by the district court. The United States asserts with regard to the district court's contract-based claim that it "does not agree with the entirety of the district court's analysis," U.S. Br. at 64, and, specifically, that it believes it need only show violation of the Nonintercourse Act to establish a basis for recovering restitutionary damages. The United States' argument with regard to New York's sovereign immunity, at base, is that because the United States could have asserted in its complaint (if granted leave to amend) a claim on which the Oneidas were permitted to proceed, we should take the United States to have pleaded this claim. We have our doubts that this casual approach to analysis of a state's assertion of sovereign immunity could ever be appropriate. *See Blatchford*, 501 U.S. at 785 (noting that "[t]he consent, 'inherent in the

land in question. *See* Def.'s Mem. of Law in Support of Motion for Summary Judgment at 3-4, Doc. 582 (Aug. 11, 2006). New York never conceded that *either* complaint adequately alleged nonpossessory claims, let alone consented to the litigation of such claims.

35

convention,' to suit by the United States . . . is not consent to suit by anyone whom the United States might select; and even consent to suit by the United States for a particular person's benefit is not consent to suit by that person himself"). It is particularly *inappropriate* in this case, moreover, given that the United States in effect disavows on appeal the claim on which the Oneidas were permitted to proceed. We therefore determine that New York is immune from suit with regard to the "contract" claim recognized by the district court and conclude that this claim must be dismissed.[14]

## B. *Cayuga* Bars the Nonintercourse Act Claim

New York next contends that the Nonintercourse Act, which does not by its terms provide for a damages remedy, cannot support a claim for damages, and that as a result, the plaintiffs' alternative "nonpossessory" claim based on violation of the Act states no grounds on which they are entitled to relief. New York argues, in addition, that this purportedly nonpossessory claim is barred by the equitable considerations described in *Sherrill* and *Cayuga*. We agree with New York as to the latter proposition and conclude, more generally, that each of the purportedly nonpossessory claims pressed by plaintiffs on appeal falls within the equitable bar recognized in *Cayuga*. Accordingly, we need not and do not address the question whether the Nonintercourse Act can support a claim seeking damages.

The equitable defense recognized in *Sherrill* and *Cayuga* is not limited to "possessory" claims — to claims premised on the assertion of a current possessory right to tribal lands held by

---

[14] Given this disposition, we need not address the State's alternative arguments that such a claim does not raise a federal question, so that the district court abused its discretion in exercising jurisdiction over it after dismissing the possessory claims, and that the contract-based claim does not exist in federal common law.

others on the theory that the original transfer of ownership of the lands was in some way flawed. Rather, the defense is properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief. *See Sherrill*, 544 U.S. at 215 n.9 ("The relief [the New York Oneidas] seek[ ] . . . is unavailable because of the long lapse of time, during which New York's governance remained undisturbed, and the present-day and future disruption such relief would engender.").

This much is clear from *Sherrill* itself. In *Sherrill*, from which the *Cayuga* panel drew the equitable principles on which it relied, the New York Oneidas sought only equitable and declaratory relief regarding the imposition of property taxes on lands to which they held legal title, and which they claimed were exempt from local taxation. *See id.* at 211-12. As it was undisputed that the plaintiffs had acquired legal title to the lands through contemporary market transactions, *see id.* at 211, no right to possession was placed at issue by their claims.[14] Despite this fact, the Supreme Court determined that the plaintiffs were barred from seeking their desired remedy due to the long lapse of time between the Oneidas' ancient dispossession and their attempt to revive sovereignty, the attendant development of justified societal expectations as to regulatory authority during this period, and the potential for the plaintiffs' desired remedy to disrupt those expectations. *See id.* at 214-21. The critical question therefore was not whether the claim at issue was premised on an

_____

[14] We recognize that the municipality imposing the property taxes in *Sherrill* had initiated eviction proceedings because of the New York Oneidas' refusal to pay. *See Sherrill*, 544 U.S. at 211. Those proceedings, however, were not directly at issue before the Supreme Court, which considered only whether the plaintiffs could seek relief preventing the imposition of taxes. Moreover, the eviction proceedings were premised on contemporary conduct, not the ancient conduct leading to the plaintiffs' original loss of the lands.

37

assertion of a current possessory right stemming from a flaw in the original termination of Indian title, but rather whether an award of relief to the plaintiffs would be disruptive of justified societal expectations arising at least in part from the long lapse of time between the conduct complained of and the effort to obtain relief.

This Court undertook the same analysis in *Cayuga*. The claims at issue in that case *were* premised on the assertion of a current possessory right to the subject lands founded on the alleged illegality of their initial transfer. *See Cayuga*, 413 F.3d at 277-78. *Cayuga* expressly held, however, that the dispositive question in ascertaining the applicability of *Sherrill*'s equitable defense is not whether a current possessory right is asserted, but whether a plaintiff's claim is inherently disruptive. *See id.* at 274 ("[W]hat concerned the [*Sherrill*] Court was the disruptive nature of the claim itself."); *id.* (indicating that the equitable defense identified in *Sherrill* "appl[ies] to 'disruptive' Indian land claims more generally"); *id.* at 277 ("[T]he import of *Sherrill* is that disruptive, forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses . . . ." (internal quotation marks omitted)); *see also id.* at 275 (concluding that possessory claims are disruptive in that they threaten "to overturn years of settled land ownership"). Under the reasoning employed in *Cayuga*, then, the equitable defense originally recognized in *Sherrill* is potentially applicable to all ancient land claims that are disruptive of justified societal interests that have developed over a long period of time, of which possessory claims are merely one type, and regardless of the particular remedy sought.

The Nonintercourse Act claim proposed by the Oneidas and by the United States is disruptive in precisely this fashion. Despite the contentions of the plaintiffs, this claim is, at base, premised on the invalidity of the initial transfer of the subject lands. The Nonintercourse Act

38

provides that "no sale of lands made by . . . any nation or tribe of Indians" undertaken without the endorsement of the United States "shall be valid." 1 Stat. at 330. Even assuming that a court may grant alternative remedies upon finding that a purported sale was consummated in violation of the Nonintercourse Act, the underlying premise of a claim based on such a violation is that the transaction itself was void *ab initio*. *See Oneida II*, 470 U.S. at 245 ("The pertinent provision of the [Nonintercourse Act] . . . merely codified the principle that a sovereign act was required to extinguish aboriginal title and thus that a conveyance without the sovereign's consent was void *ab initio*."). Such a claim, which necessarily calls into question the validity of the original transfer of the subject lands and at least potentially, by extension, subsequent ownership of those lands by non-Indian parties, effectively "asks this Court to overturn years of settled land ownership." *Cayuga*, 413 F.3d at 275. Claims having this characteristic, as *Cayuga* recognized, necessarily threaten to undermine broadly held and justified expectations as to the ownership of a vast swath of lands — expectations that have arisen not only through the passage of time but also the attendant development of the properties. Accordingly, such claims are subject to the defense recognized in *Sherrill* and *Cayuga*.

The United States contends, citing *United States v. Mottaz*, 476 U.S. 834 (1986), that allowing a claim to go forward in this case would clear the cloud on title to the subject lands created by their invalid transfer in violation of the Nonintercourse Act. We disagree. *Mottaz* involved a claim that the United States had unlawfully sold the plaintiff's interest in lands to the United States Forest Service without her consent. *Mottaz*, 476 U.S. at 836-37. The Court concluded that the claim was time-barred under the Quiet Title Act, 28 U.S.C. § 2409a(a), and that the claim was subject to that Act because it sought to confirm the plaintiff's title in her land. *Id.* at 841-42. The Court

39

distinguished the claim before it from a hypothetical claim that would not be covered by the Act, in which the plaintiff sought only "recovery of her share of the proceeds realized by the United States" from its sale of the land "but allegedly never distributed." *Id.* at 842. Such a claim, the Court said, "would involve a concession that title had passed" in the sale and would only require decision of whether the plaintiff received fair compensation. *Id.*

Unlike the hypothetical claim described in *Mottaz*, the Nonintercourse Act claim here necessarily requires a conclusion that title did *not* pass validly in the challenged land transactions, because the claim's premise is that the transactions violated the Nonintercourse Act. Plaintiffs demand not, as in *Mottaz*'s hypothetical, a share of the profits from a *concededly valid* sale that were allegedly never distributed, but "fair compensation" and "restitution" merely as substitute remedies for the return of the property that they must establish was *unlawfully taken* in order to prove their claim. The invalidity of the sale *ab initio* is the underlying premise of a Nonintercourse Act claim and any theory of recovery plaintiffs could seek pursuant to this claim. Awarding such relief here would not involve "concession[s] that title [has] passed" but rather would *establish* that it had not, but that return of the property was impossible as a remedy under the circumstances.[15]

Even if it were not barred by the Eleventh Amendment, the contract-based claim that the district court allowed to proceed must similarly fail. The claim essentially amounts to the assertion that the agreement by which the State of New York purported to acquire title was unconscionable. If a contract is unconscionable then it is also necessarily invalid and unenforceable. *See, e.g.*,

---

[15] We note also that the basis of the jury award rejected in *Cayuga* was, in part, the fair market value of the land. *Cayuga*, 413 F.3d at 272. An award of the land's fair market value would presumably, under the United States's theory, have similarly extinguished the Cayugas' possessory interest in the land, and yet this provided no basis for avoiding the equitable bar found to exist in that case.

*Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121-22 (2d Cir. 2010) (summarizing New York law). Moreover, although some previous decisions have granted reformation as a remedy for such claims, *see, e.g., Osage Nation of Indians v. United States*, 97 F. Supp. 381, 422 (Ct. Cl. 1951), and a court generally is allowed substantial flexibility in its choice of remedy when it determines that a contract or a term thereof is unconscionable, *see* Restatement (Second) of Contracts § 208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."), the traditional remedy for a claim of unconscionability is to deny enforcement of the relevant contract, *see* 8 Richard A. Lord, *Williston on Contracts* § 18.1, at 2-9 (4th ed. 1998 & Supp. 2009); 3 Dan B. Dobbs, *Law of Remedies: Damages-Equity-Restitution* § 12.8(4), at 215-19 (2d ed. 1993). The claim and its attendant remedy would again necessarily call into question and disrupt settled expectations regarding the ownership of land stemming from the original transfer of title to New York; the contract claim, therefore, like the Nonintercourse Act claim, is subject to equitable defenses.

The plaintiffs, at least for now, have elected after years of litigation to pursue particular alternative remedies that would not actually require the State of New York or the parties that have subsequently acquired the subject lands from the State to return the lands to the Oneidas. This election, however, does not exempt their claims from the defense established in *Sherrill* and *Cayuga*. *Cayuga* clearly indicated that adroit manipulation of the remedy sought will not rescue a claim where its essential premise threatens to disrupt justified societal expectations. Thus, *Cayuga* confirms that in this context the applicability of an equitable defense requires consideration of the

41

basic premise of a claim, rather than the particular remedy sought. *See Cayuga*, 413 F.3d at 275 (noting that the "disruptiveness [identified by the *Cayuga* Court was] inherent in the claim itself . . . rather than an element of any particular remedy which would flow [therefrom]"); *id.* at 277-78 (noting that the claim was subject to dismissal "*ab initio*" regardless of the remedy sought). Accordingly, we conclude that the purportedly nonpossessory claims asserted by the plaintiffs in this case are subject to the defense recognized in *Sherrill* and *Cayuga*. Moreover, for the reasons we have already discussed, this defense is not only applicable, but also serves to bar these claims.

We note that it would be significantly anomalous if we were to hold otherwise. The relevant defense, as originally articulated in *Sherrill*, served solely to bar a particular equitable remedy on account of underlying equitable concerns. *Cayuga* held that claims sounding primarily in law that would "project redress . . . into the present and future" are also subject to *Sherrill*'s equitable defense. *Cayuga*, 413 F.3d at 275 (quoting *Sherrill*, 544 U.S. at 202 n.14). The possessory claims in *Cayuga* and in this case, consisting in effect of claims for ejectment and trespass, are canonical claims at law. *See id.* at 283 (Hall, *J.*, dissenting in part and concurring in the judgment in part) ("Historically, both ejectment and trespass are actions at law." (citing 1 Dobbs, *supra*, §§ 5.1, 5.10(1))); *see also id.* at 275 (majority opinion). In contrast, the relief sought by the plaintiffs with regard to their purportedly *nonpossessory* claims — reformation of the agreements embodying the original transfer of the subject lands resulting in an award of "fair compensation" — was traditionally available *only through equity*. *See Ivinson v. Hutton*, 98 U.S. 79, 82 (1878) ("Power to reform written contracts . . . is everywhere conceded to courts of equity, and it is equally clear that it is a power which cannot be exercised by common-law courts."); 1 Dobbs, *supra*, § 4.3(7), at 619 ("Reformation [of a contract] is traditionally an equitable remedy . . . . Within limits, some

42

unconscionable contract provisions may be reformed to bring them within minimum legal standards of fairness."). Granted, the United States also seeks "restitution" in lieu of the return of the land, U.S. Br. at 58, and restitution is a form of relief available at law, *see Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212-16 (2002). The cases on which the United States relies suggest, however, that such relief in this case would also be equitable in nature. *See, e.g.*, *Felix v. Patrick*, 145 U.S. 317, 328 (1892); *United States v. Minnesota*, 270 U.S. 181, 191-92 (1926); *see also Great-W.*, 534 U.S. at 215 (describing "an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of)" as "equitable" (emphasis omitted) (quoting *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000))); 1 Dobbs, *supra*, § 4.3(5), at 608-14 (indicating that actions for restitution seeking disgorgement of profits generally have been deemed actions in equity). Even when an action for restitution is one at law, moreover, the availability of relief is animated by equitable concerns. *See* 1 Dobbs, *supra*, § 4.2(3), at 581 (citing *Moses v. MacPherlan*, (1760) 97 Eng. Rep. 676 (K.B.)). In sum, this Court concluded in *Cayuga* that the equitable defense recognized in *Sherrill* also applies against canonical actions at law. It would be strange indeed to conclude that it is *inapplicable* to closely related actions at equity or to related actions that are animated by equitable concerns. This confirms our view that the equitable defense recognized in *Sherrill* is applicable here.

Our decision also prevents the plaintiffs from converting an otherwise unsuccessful claim — like the claims asserted by the Cayuga Indian Nation in *Cayuga* — into a successful claim simply by re-framing it as "nonpossessory." As this Court has previously indicated, the essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories articulated. *Cf. Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 89 (2d Cir. 2000) ("[W]e

43

may not affirm the dismissal of [a] complaint because [the plaintiff] ha[s] proceeded under the wrong theory 'so long as [he has] alleged facts sufficient to support a meritorious legal claim.'" (quoting *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997))), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). The factual predicate of the claims asserted by the Oneidas in this case is nearly identical to that underlying the claims made by the *Cayuga* plaintiffs. *Compare* Oneida Am. Compl. ¶¶ 16-39, *with* Cayuga Compl. ¶¶ 30, 34-50. Moreover, even liberally construing the complaints here to contain some references to the claims now contended to be nonpossessory, the Oneidas and the United States, in the years prior to *Cayuga*, habitually referred to their claims as vindicating possessory rights, *see, e.g.*, Oneida Compl. at ¶¶ 11, 14-17, 21-22, 25; Tr. of Argument re: Motion to Amend at 12-13, 20, 48, 83, Doc. 136 (Apr. 2, 1999); Supp. Mem. of New York Oneidas at 1, Doc. 121 (Apr. 8, 1999) ("The simple and stark fact of this case is this case has *always* been a suit for the enforcement of present and continuing *possessory* rights."); Oneida Am. Compl. at ¶¶ 41-43, 46, 48-49, 51-52, 54-55, 58-59, 61-62; and only fully articulated their purportedly nonpossessory claims in the aftermath of *Cayuga*. The fact that the Oneidas' claims are litigated after this Court's decision in *Cayuga* has afforded them an opportunity to attempt to cast their claims in such a way as to avoid *Cayuga*'s equitable defense. The equitable principles that informed *Cayuga*, however, are no less present in this case.

Finally, the Oneidas contend that the application of *Cayuga* to the purportedly nonpossessory claims asserted here would effectively overrule *Oneida II*. We disagree. The Supreme Court indicated in *Oneida II* that there exists a federal common law cause of action by which Indian nations may seek recompense for ancient deprivations of their ancestral lands, *see Oneida II*, 470 U.S. at 236, and suggested without deciding that such a claim would not be barred by laches, *see id.*

44

at 244 n.16. *But see* id. at 263-70 (Stevens, *J.*, dissenting) (contending for four Justices that laches would bar such claims); *Felix*, 145 U.S. at 334-35 (applying laches to an action seeking to establish a constructive trust over lands conveyed in violation of a federal statutory alienation restraint); *cf. Wetzel v. Minn. Ry. Transfer Co.*, 169 U.S. 237, 241 (1898) ("The truth is, there must be some limit of time within which these excuses [for not bringing an action to cancel an unlawful land conveyance] shall be available, or titles might forever be insecure."). It is critical to note, however, that the plaintiffs in *Oneida II* asserted claims only against the Counties of Madison and Oneida, which were not alleged to have participated in the original, purportedly unlawful transfer of the subject lands but which did maintain possession of those lands. *See Oneida II*, 470 U.S. at 229. The only claim recognized by the Supreme Court in *Oneida II* was thus necessarily a claim premised on an assertion by the plaintiffs of a continuing right to possession. *Id.* at 236 ("[W]e hold that the Oneidas can maintain this action for violations of their *possessory* rights based on federal common law." (emphasis added)). *Cayuga*'s holding, which we are bound to follow, was that all claims that are "disruptive," a category which includes those premised on the assertion of a continuing possessory interest in the subject lands, are barred by the defense recognized in *Sherrill*. *Cayuga* thus found *Sherrill*'s equitable defense to be applicable to the only claim recognized in *Oneida II* — a result that was fully consistent with the Supreme Court's decision in *Oneida II*, which only recognized that the claim existed. The plaintiffs' nonpossessory claims, in contrast, have been recognized by neither the Supreme Court nor by this Court and are, as discussed above, largely equitable in nature, rendering inapplicable *Oneida II*'s concern regarding the application of equitable defenses to claims at law. *See Oneida II*, 470 U.S. at 244 n.16. In sum, then, our decision here is not in tension with *Oneida II*.

45

**CONCLUSION**

For the foregoing reasons, we conclude that all claims raised by the plaintiffs in this action, whether possessory or purportedly nonpossessory, are subject to and barred by the defense recognized in *Sherrill* and *Cayuga*. The Oneidas' contract-based claim is further barred by New York's sovereign immunity. For this reason, the judgment of the district court is **AFFIRMED** as to the dismissal of plaintiffs' possessory claims, and **REVERSED** with respect to plaintiffs' nonpossessory claims. The case is **REMANDED** to the district court for the entry of judgment and the resolution of any pending motions.

**GERSHON,** *District Judge*, concurring in part and dissenting in part:

The Supreme Court has held that the Oneida Indian Nation has "a federal common-law right to sue to enforce [its] aboriginal land rights." *County of Oneida, N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 235 (1985) ("*Oneida II*"); *see also Oneida Indian Nation of N.Y. State v. County of Oneida, N.Y.*, 414 U.S. 661, 674 (1974) ("*Oneida I*"). It has done so acknowledging that, while "[o]ne would have thought that claims dating back for more than a century and a half would have been barred long ago," "neither petitioners nor we have found any applicable statute of limitations or other relevant legal basis for holding that the Oneidas' claims are barred or otherwise have been satisfied." *Oneida II*, 470 U.S. at 253. And yet, after thirty-five years of litigation, including two trips to the Supreme Court and the intervention of the United States on plaintiffs' behalf, the majority forecloses the Oneidas from obtaining *any* remedy in this action.

Like the majority, I accept that, in light of the decision in *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266 (2d Cir. 2005), plaintiffs' claims that hinge on their possessory rights to the land fail. Unlike the majority, I conclude that *Cayuga* does not foreclose plaintiffs' non-possessory claims. Consequently, I dissent.

I.

The plaintiffs — the Oneida Indian Nation and the United States — both present two cognizable non-possessory claims. First, the United States emphasizes its federal common law claim against the State for violating the Nonintercourse Act, 25 U.S.C. § 177, when the State failed to pay the Oneidas a fair price for their land. (The Oneidas also assert a claim under the Nonintercourse Act.) This claim is consistent with the Act's "obvious purpose": "to prevent unfair, improvident, or improper disposition by Indians of lands owned or possessed by them . . .

1

." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). Put differently, the United States seeks to vindicate not its right under the Act to stop sales without its approval, but its right to ensure that when the Oneidas sold their land, they would receive a fair price. *See U.S. v. Oneida Nation of N.Y.*, 477 F.2d 939, 943 (Ct. Cl. 1973) (noting that the United States' responsibility under the Nonintercourse Act "was not merely to be present at the negotiations or to prevent actual fraud, deception, or duress alone; *improvidence, unfairness, the receipt of unconscionable consideration would likewise be of federal concern.*") (internal quotation marks omitted) (emphasis in original).

Unquestionably, the United States may sue New York for a violation of a federal statute. *See Cramer v. United States*, 261 U.S. 219, 233 (1923) ("The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies.") (internal quotation marks omitted). In other words, the United States has both an interest in this suit as trustee for the Native Americans, and an *independent* interest in ensuring that the State complies with the Nonintercourse Act. *See United States v. Minnesota*, 270 U.S. 181, 194 (1926) (holding that the United States' interest in an Indian claims suit "arises out of its guardianship over the Indians, and out of its right to invoke the aid of a court of equity in removing unlawful obstacles to the fulfillment of its obligations, and in both aspects the interest is one which is vested in it as a sovereign.")

In my view, both the United States and the Oneidas also assert a claim arising under federal common law which, as articulated by Judge Kahn, is a contract claim based on

2

unconscionability.[1] The majority does not challenge that the contract claim has been adequately pled in the Oneidas' complaint, but takes the position that the United States' amended complaint itself lacks sufficient factual allegations to support the claim. Because of disparities between the two complaints, the majority concludes that the Oneida Nation cannot take advantage of the United States' intervention to overcome the State's sovereign immunity. *See Alabama v. North Carolina*, 130 S. Ct. 2295, 2315 (2010) (concluding that a State's sovereign immunity is not compromised "by an additional, nonsovereign plaintiff's bringing an entirely overlapping claim for relief that burdens the State with no additional defense or liability.").[2]

If the majority finds the United States' amended complaint insufficient, then we should deem the United States' complaint constructively amended. *See Wahlstrom v. Kawasaki Heavy Indus., Ltd.*, 4 F.3d 1084, 1087 (2d Cir. 1993).[3] Judge Kahn found that the Oneida Nation's

---

[1]     In finding a cognizable federal contract law claim of unconscionability, Judge Kahn drew analogies from the body of law federal courts have developed relating to Indian claims seeking fair compensation from the United States. *Oneida Indian Nation of N.Y. v. N.Y.*, 500 F. Supp. 2d 128, 140-45 (N.D.N.Y. 2007). In particular, he noted that when Congress, in 1946, enacted the Indian Claims Commission Act ("the ICCA") "to hear and determine all tribal claims against the United States that accrued before August 13, 1946," it included "claims which would result if the treaties, contracts and agreements between the claimant and the United States were revised on the ground of fraud, duress, [or] unconscionable consideration . . . ." *Id.* at 140-41. Judge Kahn explained that, "[w]hile claims based on unconscionable consideration were brought pursuant to statutory right, the Court of Claims fashioned a common law rule based on preexisting precedents to determine when Indian claimants could prevail on related claims." *Id.* at 142. Caselaw developed in the Court of Claims, he reasoned, "supports a holding that when the record shows that an agreement resulted in a gross disparity between the fair market value and the price paid for the land transferred, a claim of unconscionable consideration presumptively exists and supports the revision of contract." *Id.*

[2]     The majority does not dispute that the Nonintercourse Act claim was pled by the United States and therefore does not present sovereign immunity issues.

[3]     Federal Rule of Civil Procedure 15(b)(2) provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Although this rule technically does not apply on appeal, appellate courts, using Fed. R. Civ. P. 15(b) "by way of analogy," permit constructive amendment of

3

complaint set forth adequate facts to support its non-possessory contract claim, a finding the majority does not dispute. The State, therefore, had full notice of the claim, and it never argued below that the parties' complaints were inconsistent; in fact, in its summary judgment briefing, the State described the complaints as "parallel." The State chose to bring its dispositive motion as one for summary judgment, where the theories of the case and issues would be more clearly defined than at the pleading stage. *See Swierkiewicz v. Sorema N.A*, 534 U.S. 506, 512 (2002) ("[Fed. R. Civ. P.'s 8(a)(2)'s] simplified notice pleading requirement relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."). And even after plaintiffs squarely presented the State with their non-possessory theories, the State avowed that no further discovery was necessary. All parties briefed the availability of non-possessory claims and damages extensively in their briefs on appeal. Consequently, the State would suffer no unfair prejudice; it had full knowledge of the facts and legal theories relied upon by both plaintiffs at the time of the summary judgment motion, and, given that it did not raise any disparities between the two complaints, or sovereign immunity issues, before the district court, cannot plausibly claim that it would have supported the motion any differently had there been no disparities.[4]

---

pleadings "when the effect will be to acknowledge that certain issues upon which the lower court's decision has been based or consistent with the trial court's judgment have been litigated." 6A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1494 (3d ed. 2010).

[4] Constructive amendment in these circumstances is consistent with our federal rules' instruction that "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). "This provision is not simply a precatory statement but reflects one of the basic philosophies of practice under the federal rules." 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1286 (3d ed. 2010). "One of the most important objectives of the federal rules is that lawsuits should be determined on their merits and according to the dictates of justice, rather than in terms of whether or not the averments in the paper pleadings have been artfully or

4

In addition to finding the United States' pleading insufficient, the majority also reasons that the United States "disavows" such a claim in its briefs to this court. This mischaracterizes the United States' position. The United States asserted at oral argument that there is both a federal common law contract claim and a common law Nonintercourse Act claim. Clearly the United States prefers its Nonintercourse Act claim, under which, it argues, it would not have to prove "gross inadequacy of consideration" or the "inferiority of the Oneida Indian Nation's negotiating position" to prevail. But there is nothing in its briefs or statements at oral argument that "disavows" the contract claim.[5]

In any event, whether the claim is premised on contract law or the Nonintercourse Act, the remedy would, as Judge Kahn acknowledged, be the same: "the difference between the fair market value of the land at the time and the consideration received by the Oneida Indian Nation minus any offsets, including, but not limited to, sales costs incurred by the State." *Oneida Indian Nation of N.Y. v. N.Y.*, 500 F. Supp. 2d 128, 144, 139 n.4 (N.D.N.Y. 2007) (noting that "an analysis of Plaintiffs' common law claims would be part of the determination of a remedy that

inartfully drawn." *Id.* Where, as here, a defendant has suffered no prejudice, constructive amendment is entirely compatible with this objective.

[5] Judge Kahn premised the Oneidas' and the United States' non-possessory claim on the contract claim rather than the Nonintercourse Act. This was because he found that "the Circuit recognized an implied right of action [under the Nonintercourse Act] that was possessory in nature," and that the federal common law claim was, therefore, "on stronger ground." 500 F. Supp. 2d at 139 n. 4. Although this court did, in fact, suggest that an implied right of action under the Nonintercourse Act would be possessory, it did so when only the Counties, and not the State, were the defendants in this case. *See Oneida Indian Nation of N.Y. v. Oneida County*, 719 F.2d 525, 540 (2d Cir. 1983). Because the Counties were not involved in the land transactions, the Oneida Nation could assert only possessory remedies against them. Therefore, non-possessory claims were never at issue until now.

would be commensurate with vindicating any violations of the Nonintercourse Act.").[6] Voluminous evidence of unfair compensation was before the district court. *See id.* at 145. An expert reviewed the State's records of proceeds it obtained from sales of the Oneida land to show the gross disparity between the price the State paid the Oneidas for their land and the price the State received after a quick resale. Judge Kahn also noted "previous rulings that the State paid the Oneida Indian Nation 'approximately fifty cents per acre' in 1795 to purchase about a third of the reservation and resold the land to 'white settlers for about $3.53 per acre.'" *See id.* at 145 (quoting *Oneida Indian Nation of N.Y. State v. Oneida County*, 719 F.2d 525, 529 (2d Cir. 1983)). Taken together, this evidence "suggests that there are material facts indicating that the consideration paid to the Oneida Indian Nation by the State was significantly under the then-fair market price." *Id.* Remedying the disparity would both cure the unconscionability of the original contract and disgorge the benefits the State gained by the contract in violation of federal law. *See* Dan B. Dobbs, *Law of Remedies*, § 4.1, at 552 (2d ed. 1993) (the "purpose [of restitution] is to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction.")

## II.

Determining whether plaintiffs have alleged cognizable claims is only the first part of the inquiry; the court must also consider whether both the claims and remedies the plaintiffs assert are precluded by the equitable defense articulated in *City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005) ("*Sherrill*"), and *Cayuga*. *Sherrill* was an extraordinary case. The Oneida Nation claimed that it was exempt from paying property taxes to the City of

---

[6] The Nonintercourse Act "contains no remedial provision." *See Oneida II*, 470 U.S. 238-39. Therefore, the court may "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 66 (1992).

Sherrill for land that was part of the Oneidas' historic reservation, but which had been sold by them years before, and then reacquired. Plaintiffs argued that they had regained sovereignty over the land they purchased in the open market. *See* 544 U.S. at 213. The Court rejected their "unification theory," explaining that the "standards of federal Indian law and federal equity practice" precluded the Oneida Nation from "rekindling embers of sovereignty that long ago grew cold." *Id.* at 214. The Court noted that "the question of damages for the Tribe's ancient dispossession is not at issue in this case, and we therefore do not disturb our holding in *Oneida II*." *Id.* at 221. "However," the Court concluded, "the distance from 1805 to the present day, the Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the City of Sherrill spanning several generations . . . render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate." *Id.*

In *Cayuga*, this court applied *Sherrill*'s equitable defense to bar the Cayugas' possessory land claims. The Cayugas had filed suit in 1980, alleging that the cession of certain tribal lands to the State of New York in 1795 and 1807 was never ratified by the federal government. For these violations, they, later joined by the United States, sought actual possession of their ancestral reservation land. After ruling for the Cayugas on the liability issues, the district court decided a series of issues concerning the appropriate remedy. The court concluded that ejectment was a drastic, inappropriate remedy that would "result in widespread disruption not only to the Counties and those residing therein, but to the State of New York as a whole." *Cayuga Indian Nation of N.Y. v. Cuomo*, 1999 WL 509442 at *29-30 (N.D.N.Y. July 1, 1999). The district court submitted the issue of monetary damages to a jury and the jury awarded the Cayugas damages "for loss of use and possession" of the land. *See Cayuga Indian Nation of N.Y. v. Pataki*, 165 F. Supp. 2d 266, 273 (N.D.N.Y. 2001).

7

The Second Circuit reversed. It understood *Sherrill* as holding "that equitable doctrines, such as laches, acquiescence, and impossibility, can, in appropriate circumstances, be applied to Indian land claims, even when such a claim is legally viable and within the statute of limitations." *Cayuga,* 413 F.3d at 273. It also held that *Sherrill*'s equitable considerations applied equally to the district court's "monetization" of their ejectment claim, reasoning that the main concern underlying *Sherrill*'s decision was the "disruptive nature of the claim itself." *Id.* at 274. Therefore, despite *Sherrill*'s emphasis that the question of rights was "very different" from the question of remedy, 544 U.S. at 213, the *Cayuga* court held that "[w]hether characterized as an action at law or in equity, any remedy flowing *from this possessory land claim*, which would call into question title to over 60,000 acres of land in upstate New York, can only be understood as a remedy that would similarly 'project redress into the present and future.'" *Cayuga*, 413 F.3d at 275 (emphasis added) (quoting *Sherrill*, 544 U.S. at 202).

The plaintiffs' claims at issue here—whether premised on the Nonintercourse Act or contract law—are *non*-possessory and do not "project redress into the present and future." The Nonintercourse Act claim seeks restitution of the State's profits from the State, a common remedy for violations of federal law, and one that does not implicate land ownership, much less possession. *See, e.g.*, *Securities and Exchange Comm'n. v. Texas Gulf Sulfur Co.*, 446 F.2d 1301, 1307 (2d Cir. 1971) ("[T]he Supreme Court has upheld the power of the government without specific statutory authority to seek restitution . . . as an ancillary remedy in the exercise of the courts' general equity powers to afford complete relief."). As for the contract claim, a finding that a term in the contract was unconscionable does not require "voiding" the underlying title, as the majority suggests. Even while acknowledging the "substantial flexibility" courts have to remedy such claims, the majority asserts that "the traditional remedy for a claim of

8

unconscionability is to deny enforcement of the relevant contract." Therefore, the majority concludes, "[t]he claim [of unconscionability] and its attendant remedy would again necessarily call into question and disrupt settled expectations regarding the ownership of land stemming from the original transfer of title to New York [.]"

But we are not constrained to provide only a "traditional" remedy for any violation; to the contrary, judgments "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54. As the majority itself notes, in remedying an unconscionability claim, courts can choose, as Judge Kahn did, to reform the contract, rather than void it. This has the effect of denying enforcement of the unconscionable provision — in this case, the price —while preserving the rest of the contract, including the transfer of title.

I do not agree with the implication that a claim is possessory if even one potential remedy would question title. In *United States v. Mottaz*, 476 U.S. 834 (1986), a plaintiff alleged that the United States had unlawfully sold her interest in her land and sought the market value of the land as the remedy. The plaintiff's position was that the Quiet Title Act, 28 U.S.C. § 2409a(a), which governs actions to "adjudicate a disputed title to real property in which the United States claims an interest," did not apply to her case. The Court disagreed, holding that, in "demand[ing] damages in the amount of the *current* market value of her interests," the plaintiff sought "a declaration that she alone posses[ed] valid title to her interests . . . and that the title asserted by the United States is defective . . . ." *Id.* at 842 (emphasis in original). Therefore, the Quiet Title Act applied, and, because the plaintiff had not filed within the limitations period of that Act, her claim was defective. The Court, however, acknowledged that, if she had sought merely a share of the proceeds, rather than the current fair market value of her land, "a claim for monetary

9

damages in that amount would involve a concession that title had passed . . . and that the sole issue was whether [she] was fairly compensated for the taking of her interests in the allotments." *Id*. This reasoning applies to the plaintiffs in this case: their claim, and their requested remedy, necessarily concedes that title has validly passed.

The majority distinguishes *Mottaz* by stating that awarding relief in this case "would not involve 'concession[s] that title [has] passed' but rather would *establish* that it had not, but that return of the property was impossible as a remedy under the circumstances." In doing so, the majority refers to plaintiffs' requests for "fair compensation" and "restitution" as "substitute remedies," apparently to liken what is sought here to the monetization found improper in *Cayuga*. But these are not "substitute remedies" — a term that is the majority's own, and not that of the plaintiffs or the district court — but separate *claims* with separate *remedies* pled in the complaint. *See* Fed. R. Civ. P. 8(d) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically . . . .").

The suggestion that plaintiffs raised these non-possessory claims and remedies only "to cast their claims in such a way as to avoid *Cayuga*'s equitable defense" is not to the point. Unlike the majority, I do not fault the Oneidas for adjusting their claims to recognize the changing legal landscape. It shows no disrespect to precedent to acknowledge that *Cayuga* significantly changed that landscape. *Cayuga* not only applied laches to bar Indian land claims, as well as remedies, relying on *Sherrill*, but it also applied laches to the United States' claims.[7]

---

[7] I need not address the applicability of this aspect of *Cayuga*'s holding to the present case because I do not agree with the majority that *Sherrill*'s equitable defenses apply to the non-possessory claims. However, it is worth noting that the *Cayuga* majority acknowledged that "laches is not available against the federal government when it undertakes to enforce a public right or protect the public interest." *Cayuga*, 413 F.3d at 279 n.8. Reasoning that "the United States intervened in [*Cayuga*] to *vindicate the interest of the Tribe*, with whom it has a trust relationship," the majority in *Cayuga* held that the United States was subject to a laches defense

After thirty-five years of litigation in this case, and intervening appeals in two other cases, *Sherrill* and *Cayuga*, it is not surprising or improper that plaintiffs would reevaluate and refine their positions.

At its broadest reading, *Cayuga* limits only recovery for all possessory claims; while *Cayuga* found that both legal and equitable claims could be possessory in nature, and therefore subject to equitable defenses based on disruption to settled expectations regarding land title, *Cayuga* does not compel us to find, or even suggest, that non-possessory claims are to be treated as possessory. This is particularly true here where the United States seeks to vindicate a right that is not possessory in any sense: the right to sue for a violation of its statute.

## III.

Finally, and perhaps most importantly, we must not forget the actual concerns *Cayuga* and *Sherrill* addressed. In *Cayuga*, the court wrote that "[i]nasmuch as the instant claim, a possessory land claim, is subject to the doctrine of laches, we conclude that the present case must be dismissed because the same considerations that doomed the Oneidas' claim in *Sherrill* apply with equal force here." *Caygua*, 413 F.3d at 277. A claim for actual possession, as involved in *Cayuga*, or monetization of the possessory claim, as the district court granted the Cayugas, was found to presuppose that no title ever passed to the State. This in turn introduced difficult present-day complications that would affect innocent third-party purchasers and the current value

because, it concluded, that case did not involve the enforcement of a public right or the protections of a public interest. *Id.* at 278, 279 n.8. In this case, as described above, the United States has two independent roles: as trustee for the Oneidas, *and* as a sovereign. The United States' role as a sovereign enforcing its own statute by definition "involve[s] the enforcement of a public right or the protections of a public interest." Thus, the question of laches does not rest "on facts virtually indistinguishable" to those in *Cayuga*, as the majority suggests; the different claims call for a different analysis.

11

of the developed land. These were among the considerations that had led the Supreme Court in *Sherrill* to reject the restoration of sovereignty to the Oneidas.

The nonpossessory claims and remedy involved here implicate none of these concerns. Present-day land considerations are irrelevant to the question of whether the State should disgorge the profit it earned from violating a United States statute. To calculate a restitution or fair compensation remedy, the court would not have to consider improvements to the land, settled expectations of innocent parties, or the "distinctly non-Indian character of the area and its inhabitants." *Sherrill*, 544 U.S. at 202. The distance in time matters little in this case because the damages calculation, with the exception of interest, would be no different than if this claim had been brought immediately after the alleged sales by the State.[8] In other words, a fair compensation remedy would not upset present-day expectations because it has nothing to do with the present at all.

*Cayuga* held that "the import of *Sherrill* is that 'disruptive,' forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches." *Cayuga*, 413 F.3d at 277. Nothing in *Cayuga* or *Sherrill* prohibits the purely backward-looking, non-possessory claims asserted here and the remedy described by Judge Kahn. What *Cayuga* was concerned about—whether labeled a claim or remedy—was avoiding undue disturbance of ancient land titles and settled expectations regarding them. The claims and remedy recognized by the district court in this case, and pursued now by the Oneidas and by the

---

[8]     Of course, the distance in time affects pre-judgment interest. But, as Judge McCurn recognized in *Cayuga*, prejudgment interest is an equitable matter. *See Cayuga Indian Nation of N.Y.*, 165 F. Supp. 2d at 297. The particulars of Judge McCurn's analysis have never been addressed by this Court, and there is no reason to believe that the district court, on remand, and then this Court, on appeal, could not address the equities of prejudgment interest if damages were awarded. But the potential for a large award, without more, cannot itself be treated as so disruptive as to justify dismissal of a legally sound claim.

United States, involve no such disturbance. With this decision, the majority forecloses plaintiffs from bringing *any* claims seeking *any* remedy for their treatment at the hands of the State. This is not required by *Sherrill* or *Cayuga*, and is contrary to the spirit of the Supreme Court's decisions in this very case. Therefore, I dissent and would affirm Judge Kahn's carefully considered decision and order denying summary judgment to the State.